188 So.2d 846 (1966)
Kathleen REID, Petitioner,
v.
The FLORIDA REAL ESTATE COMMISSION and George J. Saunders, Respondents.
No. 7093.
District Court of Appeal of Florida. Second District.
July 22, 1966.
*848 Ramseur, Bradham, Lyle & Skipper, St. Petersburg, for petitioner.
Frank A. Wilkinson and Robert L. Powe, Florida Real Estate Commission, Winter Park, for respondents.
PIERCE, Judge.
By petition for a writ of certiorari we have for review a final order of the Florida Real Estate Commission of February 24, 1966, suspending for a period of 60 days the registration of petitioner Kathleen Reid as a real estate broker under Chapter 475, Florida Statutes, F.S.A., and "suspending the serving of the suspension."
On June 24, 1965, the Florida Real Estate Commission, hereinafter referred to as "Commission," authorized the filing before it of an information in two counts for the purpose of determining whether her registration as a broker should or should not be revoked. Count two was later abandoned by the Commission and a portion of Count one was likewise abandoned. The part of Count one that remained in the case alleged that petitioner Kathleen Reid, hereinafter referred to as "defendant," being a registered real estate broker under the laws of Florida, on April 27, 1965, while shopping in a Winn-Dixie Supermarket at Madeira Beach, Florida 
"did, unlawfully, and with the intent to acquire the same for her own use and benefit without paying the price therefor, take and place in her purse an item of merchandise on display in said store and owned at the time by the proprietors of said store, to-wit: one `beaf steak'[1] of the value of $3.50, and thereafter concealed the same in her purse and removed the same from said store without paying the purchase price therefor.
"By reason whereof the defendant is guilty of dishonest dealing within the intent and meaning of Section 475.25(1) (a), F.S.; guilty of a crime against the laws of the State of Florida involving moral turpitude, within the intent and meaning of Section 475.25(1) (e), F.S."
In plain language, the information charged defendant with stealing a $3.50[2] piece of beaf steak from a Supermarket. Such conduct, the information alleged, constituted a violation of two stated provisions of F.S. Chapter 475, F.S.A., known as the "Real Estate License Law."
These provisions, omitting the surplusage, are in language of the Statute as follows:
"475.25 Grounds for Revocation of Suspension.
"(1) The registration of a registrant may be suspended * * * upon a finding *849 of facts showing that the registrant has:
"(a) Been guilty of * * * dishonest dealing * * * in any business transaction; * * *" or
"(e) Been guilty of a crime against the laws of this state * * * involving moral turpitude, * * *."
The defendant filed a written answer with the Commission denying any dishonest dealing or any violation of Florida law or any intent so to do. She alleged she had been going through a period of untold mental anguish and nervous discomfort, with emotional problems that brought on persistent headaches, all caused generally by what is commonly known as "the change of life." She denied any intent to commit a crime; alleged that she could not explain why she took the meat except that she was emotionally upset, distraught and under extremely high tension; that she had already made several purchases in the store, "including the right number of steaks to be used for dinner"; and generally that she had been experiencing an intensive upset condition, physically and mentally, for sometime last past, produced by pre-menstrual tension and severe headaches. Two sons in the family had graduated from school the day before, one from the University of Florida, and her visit to the Supermarket on that occasion was to buy groceries and other items for the family celebration which was to follow.
The Commissioner appointed an Examiner under F.S. Chapter 120, F.S.A.,[3] with directions to hear and receive the evidence presented by the parties and to exercise such powers and duties as are prescribed for such examiners under F.S. Chapter 120, F.S.A.,[3] including the making of findings of fact and conclusions of law, and to file a recommended order with the Commission.
On December 15, 1965, the Examiner so conducted the hearing, at which time extensive testimony was taken and exhibits introduced. Thereafter, on January 17, 1966, the Examiner filed with the Commission the transcribed record of all such testimony and evidence, together with his "Recommended Order" incorporating therein his "Findings of Fact" and his "Conclusions of Law." His "conclusion" was that the Commission had failed to prove the defendant guilty as charged.
The attorney for the Commission filed "exceptions" to the Examiner's Recommended Order, agreeing with the Examiner's findings of fact in toto but contending that the Examiner's conclusion was "(a) inconsistent with the evidence * * * and (b) not the applicable rule of law pertaining to the mental competency of an offender against the laws of the State of Florida."[4] The Commission thereupon entered final order which approved and adopted the findings of fact of the Examiner as the findings of fact of the Commission, disapproved the Conclusions of Law of the Examiner, sustained the objections thereto, and adjudged defendant guilty of violating the sub-sections of the Statute hereinbefore quoted, ante p. 2-3. The Commission's order ended with a peculiar penalty provision  two of the three-member Commission suspended for a period of sixty days the defendant's registration as a broker *850 but directed that "the serving of the said period of suspension * * * is hereby suspended," while the third member, who happened to be the Chairman, "desired to impose a reprimand only and directed that his dissent from the action of the Commission be noted." The case is now before this Court upon application for a writ of certiorari to review said order.
The findings of fact in the Examiner's recommended order, exclusive of the medical findings, are as follows:
"FINDINGS OF FACT
"1. The Defendant, Kathleen Reid, was at all times hereto a registered real estate broker trading as Kay Mitchell, 15008 1/2 Madeira Way, Madeira Beach, Florida. The Defendant is also known as Kathleen McCaughy Reid.
"2. On April 27, 1965, the Defendant was shopping in a Winn Dixie supermarket in Madeira Beach, Pinellas County, Florida, where she was observed by the manager and assistant manager of said supermarket. Both the manager and the assistant manager saw the Defendant take a steak from the meat container in the store and subsequently place the same in her purse. They continued to observe the Defendant until she checked out at the check-out counter and paid for some other groceries that she had purchased, but not the steak, and started out the front door of the store. After the Defendant walked out of the store, the manager acosted her and asked her if she had not forgotten to pay for something. She said she did not think that she had forgotten to pay for anything and appeared not to understand what it might have been until she was told what it was, and then she took the steak out of her pocketbook. She was asked to come into the office of the store which she did, and the Madeira Beach police were called. While she was in the office she offered to pay for the steak and the manager told her it was too late. The value of the beef steak was under Five ($5.00) Dollars, being valued at something between $2.58 and $3.08. She was then taken to the police station.
"3. The Defendant is forty-nine (49) years old and the wife of the Claims Manager for Royal-Globe Insurance Companies. She has for a number of years been engaged in the activities of a real estate broker in the Gulf Beach area west of St. Petersburg, Florida, and during such period of time has enjoyed the confidence of the area as one of its prominent real estate brokers. Not that it is material to the case, but her arrest became somewhat of a `cause celebre'. A number of her fellow brokers and also a vice-president of Guaranty Abstract Title and Insurance Company whose office is in St. Petersburg, have the opinion that Defendant has possessed the reputation of good character and honesty over the number of years they have known her and, although they are aware of the unfortunate incident, the same has not affected their opinion as to her honesty and integrity."
It will be noted, from the progress of the administrative proceeding hereinbefore depicted, that the findings of fact made by the Examiner were approved by the Commission and in fact adopted by reference as the Commission's own findings. The Commission sustained the exceptions filed by its own attorney and set aside the Examiner's conclusions of law, and concluded instead that the findings of fact so made and adopted proved the defendant to be guilty of the violation set forth in the information and in the Statute. We disagree with the Commission's conclusions and uphold the Examiner's findings and conclusions
A. Nature of the Violation. The taking away of a person's license to engage in a privileged business or profession by administrative action is one of the most drastic proceedings known to the law. At one stroke of the pen it takes aways his *851 means of livelihood, and casts an immediate blight upon his whole life and that of his family and business associates. The real estate broker's license to engage in that business is no less important to him or her than a license to practice law or medicine is to a lawyer or doctor. Such license is not only a paper writing that permits the holder to legally engage in the activities described therein, but it is also a proclamation to the world that the person to whom the license is issued has qualified to be chosen as a recognized member of a privileged business or profession. It is a most valuable property right; one to be proud of and to be zealously guarded and protected. It singles out a person as being an honorable citizen in the society of people.
This is not to say that an administrative licensing board should hesitate to take away such license  in a proper case and upon sufficient cause. An undeserving recalcitrant or chronic offender, especially in the field of serious matters, should be severely dealt with: he has forfeited his right and privilege to stand with the honorable members of his profession. But the struggle to acquire the privileged license in the first instance necessarily entails much sacrifice, hardships, expense, and physical and mental labor and endurance; and the summary revocation of such right is a most solemn thing.
Let no one be disillusioned or under any misapprehension that this Court is "against" regulatory or administrative Boards or Commissions. Quite the contrary. We are readily cognizant of the importance of the administrative processes. The administrative concept, operating within its quasi-judicial sphere, is a valuable and indeed indispensable adjunct of the governmental structure of our State. The writer of this opinion was chief counsel for administrative and regulatory agencies in Florida for thirty-five years and is peculiarly sensitive to the day-by-day handicaps and difficulties of such bodies. He knows the problems they encounter and the frustrations they experience. He also knows the far-reaching power and authority reposed in such agencies. The power to revoke a license should be exercised with no less careful circumspection than the original granting of it. And the penal sanctions should be directed only toward those who by their conduct have forfeited their right to the privilege, and then only upon clear and convincing proof of substantial causes justifying the forfeiture.
In Horne v. Florida Real Estate Commission, Fla.App.1964, 163 So.2d 515, the defendant broker Horne was charged by the Real Estate Commission in an information with being guilty of false pretenses and dishonest dealing in fraudulently attempting to procure a listing commission in a real estate transaction, even to the point of pressing a claim therefor in a legal proceeding. In reviewing the Commission's administrative proceeding, the Court held that Horne had "a right to adjudicate her claim in the courts of this State, and whether it is or is not an enforceable claim * * * is not grounds for suspension of her registration." In discussing prior Court decisions reviewing the Commission's suspension orders, the 1st District Court in Horne commented as follows:
"In general these cases have held that the frequency of past unscrupulous practices in Florida real estate dealings are of such public interest as to make the subject amenable to regulation by properly enacted legislation. The fiduciary relationship between customer and broker, inviting and usually receiving a high degree of trust and confidence, is a proper subject for reasonable regulation. The purpose of the statute and these regulations is to protect the public by permitting only those who possess special qualifications of aptitude, ability and integrity to engage in the business. The duty to determine the continued eligibility and qualification of registrants has been vested in the Real Estate Commission in accordance with the procedures provided by Chapter 475. Disciplinary procecdings *852 under this chapter are for the primary purpose of protecting the general public from unscrupulous or dishonest real estate operators." (Emphasis supplied).
In Cohen v. Florida Real Estate Commission, Fla.App.1964, 161 So.2d 252, the 3rd District Court reviewed an information before the Commission based upon the alleged cheating by the defendant Cohen on an examination held in connection with the Commission's licensing procedures. The Court, in quashing the information before the Commission, held as follows:
"The information charges that the real estate salesmen cheated on an examination in a course conducted by the General Extension Service of the State University System. It is further charged that the successful completion of this course is a necessary incident to advancement in rank from salesman to real estate broker. The statute upon which the information is based is:[5]
* * * * * *
"It is immediately apparent that to be a proper charge the information here must be found to set forth either dishonest dealing in a business transaction or a violation of duty in a real estate transaction. However reprehensible the conduct charged may be, it does not come within the ordinary meaning of either of the statutory prohibitions.
"It is earnestly contended by the commission that men who cheat on examinations ought not be allowed to be real estate salesmen. We must agree, but neither should men who cheat at cards. Unfortunately, this statute does not cover either case."
In the Horne opinion, the last paragraph in Cohen, quoted above, ending with the words "[u]nfortunately, this statute does not cover either case," was quoted and the Court in Horne commented as follows:
"In our opinion, it is fortunate that the statute does not cover either case."
In Brod v. Jernigan and Florida Real Estate Commission, Fla.App. 1966, 188 So.2d 575, released June 29, 1966, not yet published, this Court observed as follows:
"Chapter 475 vests in the Florida Real Estate Commission a broad discretionary power and authority to supervise the privileged business of real estate broker and to deal firmly with those engaged in it, even to the point of taking away their means of livelihood by revocation or suspension of license. But such potent administrative weapons must always be reasonably and cautiously, and even sparingly, utilized. The administrative processes of the Commission should be aimed at the dishonest and unscrupulous operator, one who cheats, swindles, or defrauds the general public in handling real estate transactions." (Emphasis supplied).
As far back as 1929, the Supreme Court of Florida, in construing the Statute here involved, in State ex rel. Davis v. Rose, 1929, 97 Fla. 710, 122 So. 225, text 239, said:
"The purpose of the statute under consideration is to stabilize real estate transactions and to protect the public against financial loss through future repetition of unscrupulous practices in transactions involving the sale and purchase of real estate." (Emphasis supplied).
In Schindler v. Florida Real Estate Commission, Fla.App. 1962, 144 So.2d 862, 863, the real estate broker Schindler was charged with having employed certain non-registered persons (Graham and Nobbs) as real estate salesmen, and also with having participated with Graham and Nobbs in claims for commissions. A Commission order finding Schindler guilty under Chapter 475 and suspending his license as broker was *853 quashed by the 3rd District Court on the ground that the two transactions involving commissions 
"* * * related to the sale of businesses, and the leases transferred in connection therewith were incidental. Those transactions, therefore, were not subject to control under the Florida Real Estate License Law", citing Hughes v. Chapman, 5 Cir.1959, 272 F.2d 193. (Emphasis supplied).
The rationale of Schindler is that, to justify revocation of a broker's license, the transaction made the basis of the charge must be in connection with, and over which, the Commission has jurisdiction, namely, the real estate brokerage business.
In Branch v. State, 1930, 99 Fla. 444, 128 So. 487, the Supreme Court reversed a Circuit Court order revoking the license of attorney Branch to practice law in Florida, which order of revocation was based upon Branch's conviction of assault with intent to murder a police officer, and upon which conviction he had received a sentence of ten years in the State Prison, which had been affirmed by the Supreme Court, and which sentence he was actually serving when the disbarment order was entered. The Supreme Court held that the criminal conviction on the charge aforesaid did not show Branch to be a person unfit for the trusts and confidences to be reposed in a person licensed to practice law.
We are cognizant of the case of Phillips v. Mann, Fla.App. 1962, 147 So.2d 559, where an order of the Commission suspending a real estate broker's registration was upheld upon a finding of the Commission that broker Phillips "had conspired with others to defraud a potential judgment creditor" in a matter that did not directly involve a real estate transaction. However, it was a real estate transaction that had brought Phillips into original contact with his co-conspirators, with whom he later allegedly conspired to defraud a third party creditor. Also, the opinion in Phillips was grounded upon the authority of the cases of Ahern v. Florida Real Estate Commission, 1942, 149 Fla. 706, 6 So.2d 857, and Anderson v. Florida Real Estate Commission, Fla.App. 1958, 105 So.2d 918, which do pertain to real estate transactions.
In Ahern the broker's license was suspended by the Commission upon a finding that the broker had received and accepted a sizeable cash deposit for the purchase of certain real estate upon the pretense that the broker represented the owner thereof as her broker, whereas in fact he had no connection with the owner and converted to his own use the cash deposit so entrusted to him. This definitely involved a real estate transaction.
In Anderson the Court upheld an information brought by the Real Estate Commission to revoke the broker's license of petitioner Anderson 
"for the reason that petitioner was guilty of fraud, concealment, dishonest dealing, trick, scheme or device in a business transaction with Ellen Custer, another broker, in that petitioner obtained Custer's release of an agreement to divide commissions on certain real estate transactions without disclosing to Custer that petitioner had already obtained an offer on the real estate transaction, and that petitioner then completed the transaction, collected the commission and refused to divide the commission according to said agreement." (Emphasis supplied).
It cannot be denied that Anderson involved a real estate transaction. There are myriads of dealings and transactions within the scope of a broker's activities, other than the actual sale of real estate, which would still be within the Commission's disciplinary jurisdiction.
We hold that the subject matter of the violation here involved, to-wit, the theft of one $3.00 beaf-steak, was not such a substantial "dishonest dealing * * * in a business transaction" as to warrant suspension *854 of defendant's license as a broker; assuming with tongue-in-cheek that the incident ever assumed the status of "a business transaction."
B. Guilty of Crime under Florida Law. We are here brought to consider whether under the findings of fact defendant was proven guilty of any Florida penal law. The exact language in Section 475.25(1) (e), defining the violation with which we are presently concerned, is:
"Been guilty of a crime against the laws of this state * * * involving moral turpitude * * *."
There is no doubt that, under this definition, the findings must be sufficient to make out a case establishing the crime under Florida law: in this instance, petty larceny. And this, of course, would include proof of every element going to make up the crime; otherwise no crime has been shown under Florida law. One of these indispensable elements is the existence of criminal intent on the part of the defendant at the time of the doing of the act involved. And this would include, in turn, proof of the legal capacity to entertain or form the requisite intent.
Larceny is the stealing, taking and carrying away of the personal property of another with intent to deprive the owner thereof of his property permanently. And in order for a conviction to be had on the charge of larceny, there must have been a felonious intent, that is, a conscious purpose to steal that which did not belong to the taker, the felonious intent to steal and take. Masters v. State, 1947, 159 Fla. 617, 32 So.2d 276; Canada v. State, Fla.App. 1962, 139 So.2d 753. The criminal intention constitutes the offense and it is the criterion which distinguishes it from trespass. It is always necessary that it be shown that the property was taken animo furandi to sustain a finding of guilt. Maddox v. State, Fla. 1948, 38 So.2d 58; Helton v. State, 1938, 135 Fla. 458, 185 So. 864; Flint v. State, 1940, 143 Fla. 259, 196 So. 619; American Fire & Cas. Co. v. Sunny South Aircraft Service, Inc., Fla. 1963, 151 So.2d 276; Rosengarten v. State, Fla.App. 1964, 166 So.2d 183. And the felonious intent must exist at the actual time of the taking. Groover v. State, 1921, 82 Fla. 427, 90 So. 473, 26 A.L.R. 373; Helton v. State, supra.
A person otherwise sane and competent may nevertheless be under a lawful mental disability so as to be incapable of formulating a rational intent to do a particular act at a particular time. Thus legal "insanity" which incapacitates from civil responsibility and exonerates from crime is a mental deficiency with reference to the particular act in question, although it may not be a general incapacity. Britts v. State, 1947, 158 Fla. 839, 30 So.2d 363; Davis v. State, 1902, 44 Fla. 32, 32 So. 822, text 828; Argent v. United States, C.A.Fla. 1963; 325 F.2d 162. The guilt of a person laboring under partial delusions, not otherwise insane, must be considered as if the facts with respect to which the delusion exists were real. Blocker v. State, 1926, 92 Fla. 878, 110 So. 547.
Although "irresistible impulse" and "moral insanity" do not exist as categorical defenses in Florida, yet it has been held in a border-line case that, under Florida law, a person is entitled to acquittal on the ground of mental incapacity if at the time of the commission of the act he either did not know the difference between right and wrong or he was unable to refrain from doing wrong; and it is not necessary that both conditions be present. Thus if it is established from the evidence that as the result of some mental defect or disease a person was unable to refrain from doing wrong, such as transporting a forged check in Interstate Commerce, he could not be held criminally responsible notwithstanding he did not deny the commission of the act nor deny that he knew the difference between right and wrong. Argent v. United States, supra.
*855 And further illustrative of the question being considered are the cases decided by the Supreme Court of Florida which hold that, notwithstanding voluntary drunkenness is generally no defense to the commission of a crime, yet where a specific intent is requisite to conviction and the drunkenness though voluntarily induced has operated to deprive the accused of the mental capacity to form such intent, a finding of guilt is precluded. Jenkins v. State, 1909, 58 Fla. 62, 50 So. 582; Britts v. State, supra. And especially may this principle be applied when the inebriate condition is of sizeable duration. Cochran v. State, 1913, 65 Fla. 91, 61 So. 187; Askew v. State, Fla. 1960, 118 So.2d 219. A person who is precluded by mental disease from knowledge of what he is doing, or who knows what he is doing but does not know that the act is wrong, is not criminally responsible for the act. Perry v. State, Fla.App. 1962, 143 So.2d 528.
We turn now to the record to determine what defendant's mental condition, as respects her legal capacity for committing a crime, was at the time of the act in question. The findings of fact of the Examiner and the Commission on this point are here set forth:
"Two medical doctors testified in behalf of the Defendant; one a qualified doctor in psychiatry and the other a medical doctor engaged in general practice and the family physician of the Defendant for a period of years. The defendant on the date in question had entered the Winn Dixie store to purchase items for a family dinner, it being the day following her son's graduation from the University of Florida and a family celebration was to follow. Another son in the family of her husband had likewise graduated on the same day. She was going through what is commonly known as `the change of life' and had experienced persistent headaches and emotional problems for sometime prior to the incident. She was hospitalized on the fourth day after the incident occurred and attended by her medical doctor, as well as examined by the psychiatrist. It is apparent that the Defendant, at the time of the incident, was under a certain amount of anxiety, tension and stress which was described by her medical doctor as an anxiety syndrome. His medical opinion was that the taking of the steak was an isolated-behavior incident produced by her menopause state, and on the day that the Defendant committed the act, she knew and was consciously aware of the fact that she was doing wrong. At the same time it was his opinion, based upon a reasonable medical certainty, that she could not have helped herself under the physical and mental stress she was undergoing at the time." (Emphasis supplied).
The Examiner's conclusion of law is as follows:
"I conclude that at the time the Defendant took the steak she was unable to form any rational intent with respect to her act of so doing due to her physical and mental state, and therefore that the Plaintiff failed to prove the Defendant guilty as charged in Count I." (Emphasis supplied).
The defendant was 49 years old, the wife of an insurance executive, and for a number of years had been engaged as a real estate broker in the Gulf Beaches area west of St. Petersburg, during which time she had enjoyed the confidence of the community as one of its more prominent brokers. A number of her fellow brokers, as well as the Vice President of one of the leading abstract and title insurance companies in St. Petersburg, evidenced her good character and honesty over a number of years and stated their opinion as to her honesty and integrity had not been affected by knowledge of the Supermarket incident. These facts were included in the Examiner's findings which the Commission adopted.
We hold that her mental condition at the time of the act involved, particularly as it *856 pertained to her capacity to refrain from doing the act, comes well within the scope of the foregoing cases cited, and that the Examiner, who is a highly capable and experienced member of the Tampa bar and in whose judgment and ability the Commission must have reposed confidence, was correct in the conclusion he reached.
While this case has not been free from difficulty we are impelled to the view that, upon the entire record, the defendant should not suffer the sanctions imposed by the Commission. Accordingly, the writ of certiorari is granted, and the final order of the Commission is quashed, with directions to enter order dismissing the information.
So ordered.
ALLEN, C.J., and LILES, J., concur.
NOTES
[1] This is the way "beaf" is spelled in the information so we will merely follow suit.
[2] Later, the value seemed to be reduced to from $2.50 to $3.08 (Examiner's findings).
[3] F.S. Ch. 120, F.S.A. is a comprehensive Act known as the Administrative Procedure Act. Under Sec. 120.25, a hearing officer, in addition to presiding over an administrative hearing, has authority to (1) administer oaths, (2) issue subpoenas, (3) rule upon matters of evidence, (4) take depositions when desirable, (5) regulate the hearing, (6) encourage settlements, (7) dispose of matters of procedure, and (8) "[e]nter any order to carry out the purposes of this law, or * * * make recommended orders to the agency * * *, which orders shall include findings of fact."
[4] The "exceptions" do not enlighten the Commission, nor this Court, as to what is "the applicable rule," so we will have to find and express it ourselves. See infra, p. 15, et seq.
[5] Here the Statute is quoted, F.S. Section 475.25(1), F.S.A., which is the same statute involved in the case sub judice as to "dishonest dealing," and incidentally is the same statute involved in the Horne case, supra.