# OFFICE OF THE COMPTROLLER v DIKO INVESTMENTS, INC., et al.

## Case No. 86-3282

State of Florida, Division of Administrative Hearings

November 30, 1987

### APPEARANCES OF COUNSEL

**Lawrence S. Krieger** for petitioner.

**Keith A. Seldin** for respondent.

### OPINION OF THE COURT

JOYOUS PARRISH, Hearing Officer.

#### RECOMMENDED ORDER

Pursuant to notice, a final hearing in the above-styled matter was held on August 18-20, 1987, at West Palm Beach, Florida, before Joyous Parrish, a duly designated Hearing Officer of the Division of Administrative Hearings.

#### BACKGROUND AND PROCEDUREA MATTERS

On July 7, 1986, the Office of the Comptroller filed a "Notice of Intent to Revoke and Administrative Charges and Complaint" against Diko Investments, Inc. and Dieter Kolberg. This notice alleged ten

violations of Chapter 494, *Florida Statutes* which the Respondents denied in a response mailed August 12, 1986.

On August 21, 1986, the case was forwarded to the Division of Administrative Hearings for formal proceedings.

On April 30, 1987, Petitioner moved to amend its complaint to allege a failure to deliver a mortgagee title insurance policy or an opinion of title in violation of Section 494.08(7), *Florida Statutes*. By order entered May 11, 1987, such motion was granted. Thereafter, Petitioner filed a second Motion to Amend Complaint and Respondents opposed such motion in a response filed July 16, 1987. By order entered July 24, 1987, the second Motion to Amend Complaint, to the extent it sought to add two complainants, was denied; however, with the deletion of paragraphs 5-26, the Amended Complaint filed July 6, 1987, stands as the charging document in this cause.

The Amended Complaint alleged:

Count I: misrepresentation or false promises likely to influence,persuade or induce action, in violation of Section 494.05(1)(a), *Florida Statutes;*

Count II: negligence or incompetence in performing acts for which they are required to be licensed and have misused or misappropriated monies entrusted to their care, to the harm of a borrow, and/or lender in violation in Section 494.05(2), *Florida Statutes;*

Count III: willfully falsifying, concealing, or covering up a material fact in violation of Section 494.093(2), *Florida Statutes;*

Count IV: failure to maintain all records and documents according to the requirements of Section 494.06(3), *Florida Statutes;*

Count V: failure to disburse funds in accordance with agreements in violation of Section 494.05(1)(c), Sections 494.052(1) through (5) and Section 494.055(1)(g), *Florida Statutes;*

Count VI: conduct constituting a cause for denial of a license pursuant to Sections 494.05(1)(h) and 494.04(4), *Florida Statutes;*

Count VII: withdrawn

Count VIII: failure to account or deliver in violation of Section 494.05(1)(e), *Florida Statutes* and Section 494.055(1)(f), *Florida Statutes;*

Count IX: failure to obtain a license to act as a mortgage broker or solicitor before so acting in violation of Section 494.04(1), *Florida Statutes;*

Count X: failure to timely deliver to lenders statements showing

balances owed by the mortgagor on any existing mortgages prior to the investment in violation of Section 494.08(9), *Florida Statutes;* and

Count XI: failure to timely deliver to the lender a copy of a mortgagee's title insurance policy or opinion of title, in violation of Section 494.08(7), *Florida Statutes;*

At the hearing Petitioner moved to amend to add a charge of breach of trust funds or misuse of entrusted property in violation of Section 494.055(1)(h), *Florida Statutes.* Ruling on such motion was reserved at that time but such motion is hereby denied.

No transcript was made of the proceedings. By agreement, the parties were granted leave until September 20, 1987, to file their proposed findings of fact and conclusions of law. Both parties filed proposals; they have been carefully considered in the preparation of this Recommended Order and specific rulings on the proposed findings of fact are included in the attached Appendix.

## ISSUE

The central issue in this case is whether the Respondents are guilty of the violations alleged in the Amended Administrative Complaint; and, if so, what penalty should be imposed.

## FINDINGS OF FACT

Based upon the testimony of the witnesses and the documentary evidence received at the hearing, I make the following findings of fact:

1. The Department of Banking and Finance, Division of Finance, is charged with the responsibility of administering the provisions of Chapter 494, *Florida Statutes.*

2. At all times material to the allegations in this case, Diko Investments, Inc. ("Diko") conducted business as a mortgage broker in Palm Beach County, Florida.

3. At all times material to the allegations in this case, Dieter Kolberg ("Kolberg") was an officer, director, and acted as principal mortgage broker for Diko.

4. Kolberg passed the mortgage broker's examination on May 28, 1985. Diko was issued a license as a mortgage broker with Kolberg as its principal broker on June 26, 1985 (license no. HB-16568).

5. Prior to May 28, 1985, Diko ran advertisements soliciting investors for mortgage opportunities. These ads included Kolberg's home telephone number.

6. Prior to May 28, 1985, Kolberg/Diko entered into a business

**177**

relationship with Michael D. Circullo, a licensed mortgage broker, to "co-broke" mortgage transactions. Pursuant to their agreement, Cirullo represented the borrower/mortgagor while Kolberg obtained and represented the lender/mortgagee.

7. Kolberg and Cirullo solicited and negotiated at least two loans prior to May 28, 1985. Kolberg acted in expectation of being paid as a mortgage broker. Cirullo remitted 50 percent of the commissions earned on these transactions to Diko.

8. Diko stationery included the phrase "Licensed Mortgage Bankers." Neither Diko nor Kolberg had been licensed as a "mortgage banker."

9. In August and September of 1985, investors, Marcel and Ida Barber, responded to a Diko investment which offered a 16 percent interest mortgage loan secured by prime residential real estate. The Barbers were interested in a safe, high interest-yielding investment and requested more information from Diko.

10. On September 23, 1985, Kolberg wrote to the Barbers to outline the following business policies of Diko:

The first objective of the Diko lending program was "The Safety of the Investor's Capital."

Any investment was to be secured by a mortgage on prime residential real estate clear of all liens with the exception of a first mortgage where a second mortgage would be given.

Investors would be issued mortgagee title insurance to insure against loss due to defects in title to the mortgaged property.

Investors would be issued fire and hazard insurance to cover any losses in the event of fire or storm.

11. Subsequent to the receipt of the aforesaid letter, the Barbers decided to invest $25,000 in a mortgage through Diko/Kolberg. This initial transaction proceeded satisfactorily and the objectives addressed in paragraph 10 above were met.

12. In late December, 1985, the Barbers advised Kolberg that they would be willing to invest an additional $50,000 in early January, 1986. The Barbers expected the transaction to be handled in the same manner as their prior investment through Diko.

13. After reviewing two or three loan proposals, the Barbers chose to invest in a loan to Tony Medici/Automatic Concrete, Inc. The loan was to be secured by a second mortgage on property at 713-717 "L" Street, West Palm Beach, Florida. The "L" Street property consisted of

a 24-unit apartment complex and an adjacent laundry facility. Kolberg accompanied the Barbers to view the property. During discussions with the Barbers regarding the proposed investment, Kolberg made the following false material representations:

That the property had a high occupancy;

That rental payments were guaranteed or subsidized by a government program;

That the asset-to-debt ratio for the property was acceptable; and

That a proposed expansion of the laundry facility would further enhance the security of the loan.

14. Financial statements of the borrower (Medici/Automatic Concrete, Inc.) did not include all obligations against the "L" Street property. Diko/Kolberg did not give the Barbers an accurate or complete statement of the financial condition of the "L" Street investment. Kolberg knew the information on the statement was incomplete.

15. Diko/Kolberg did not disclose to the Barbers the high rate of crime in the area which compromised the security of the "L" Street investment. Kolberg knew of the crime problem in the area.

16. Diko/Kolberg did not disclose to the Barbers that foreclosure proceedings had been instituted against the "L" Street property. Kolberg knew of the foreclosure action as well as the delinquency on other obligations.

17. Kolberg did not disclose to the Barbers that he represented, as trustee, a Kolberg family company which would directly benefit from the Barber loan. The Barber loan would satisfy a mortgage held by Kolberg, as trustee, on the subject property, which mortgage was in default and in the process of foreclosure (the Ropet Anlagen foreclosure).

18. Kolberg did not disclose to the Barbers that another mortgage held on the "L" Street property (David Marsh loan) was also in default. A subordination agreement was required to be executed by Marsh in order for the Barber/Medici loan to close. Marsh agreed to subordinate his mortgage position for approximately $3000 in arrear payments. Marsh was owed approximately $125,000 but chose to subordinate because by doing so he was able to recoup a small amount of what he considered a lost investment. Kolberg knew of Marsh's situation and did not advise the Barbers.

19. The Barber loan to Medici/Automatic Concrete, Inc. closed on January 18, 1986. The Barbers delivered a check for $53,000 payable to

**179**

the title company chosen by Diko. Neither Diko nor Kolberg gave the title company, Manor Title, closing instructions to protect the lenders' interests. Kolberg did, however, instruct the title company to list expenses relating to the Ropet Anlagen foreclosure against the Medici loan.

20. Proceeds from the closing, in the amount of $50,000 were paid to Kolberg, as trustee for "Ropet Anlagen," and deposited to an account by that name. The name "Ropet Anlagen" translates to "Ropet Investments." Kolberg handles all transactions for this Kolberg family company in the United States. (Kolberg has two sons, Robin and Peter, from a former marriage. The name "Ropet" may derive from their names.)

21. Kolberg's former wife, Patricia Kolberg, owns an interest in Ropet Anlagen. Regular monthly payments were made by Kolberg to Patricia Kolberg on a Ropet Anlagen account. Many of the checks drawn on the Ropet Anlagen account were for personal expenses of Kolberg or his business.

22. The first mortgage on the "L" Street property was 45 days overdue on January 13, 1986. Kolberg knew of this delinquency but did not advise the Barbers. To the contrary, Diko gave the Barbers an estoppel notice from a prior closing showing the first mortgage to be current. The first mortgagee ultimately foreclosed its mortgage and the Barbers lost their entire investment.

23. The Barbers did not receive a fire and hazard insurance policy to cover losses in the event of fire or storm for the "L" Street property.

24. The Barbers did not receive a mortgagee title insurance policy until March, 1986, by which time the first mortgage was further in default. Additionally, a mortgagee policy disclosed a financing statement and a collateral assignment of rents recorded prior to the Barbers' mortgage.

### CONCLUSIONS OF LAW

1. The Division of Administrative Hearings has jurisdiction over the parties and the subject matter of these proceedings.

2. The correct standard for the revocation of a license, as in the case at issue, is that the evidence must be clear and convincing. *Ferris v. Turlington,* 510 So.2d 191 (Fla. 1987). The *Ferris* court agreed with the district court in *Reid v. Florida Real Estate Commission,* 188 So.2d 846, 851 (Fla. 2d DCA 1955), that:

The power to revoke a license should be exercised with no less

180

careful circumspection than the original granting of it. And the penal sanctions should be directed only toward those who by their conduct have forfeited their right to the privilege, and then only upon clear and convincing proof of substantial causes justifying the forfeiture.

This elevated standard is necessary to protect the rights and interests of the accused where the proceedings implicate the loss of livelihood. *Ferris* at 295. This standard has been applied as to each count of the Amended Administrative Complaint.

3. Section 494.05(3), *Florida Statutes* (1985) provides:

(3) If a licensee is a person other than an individual, it shall be sufficient cause for the suspension or revocation of a license that any officer, director, or members of the licensed corporation, partnership, association, or other group has so acted or failed to act as would be cause for suspending or revoking a license to such party as an individual.

4. The evidence established that Diko was licensed with Kolberg as its principal mortgage broker and president. It is undisputed that all acts or omissions complained of occurred with Kolberg acting individually and in his corporate capacity for Diko. Accordingly, each count of the Amended Administrative Complaint is addressed to impute the acts or omissions of Kolberg to Diko.

5. Section 494.05(1)(a), *Florida Statutes* (1985) provides:

(1) The department may, upon its motion, or upon the verified complaint in writing of any person, investigate the actions of any person engaged in business or acting in the capacity of a licensee under this act, within this state. The license of a licensee may be suspended for a period not exceeding 2 years, or until compliance with a lawful order imposed in the final order of suspension, or both, upon a finding of facts showing that the licensee has been built of any of the following: (a) Making any false promises likely to influence, persuade, or induce; or pursuing a course of misrepresentation or false promises through agents or solicitors, or advertising or otherwise.

6. Kolberg led the Barbers to believe that the Medici/Automatic Concrete, Inc. transaction would be handled in the same manner as a prior loan. The first loan had been to a financially stable borrower. Mortgagee title and fire/hazard insurance policies had been properly and timely issued. In the Medici loan the Barbers relied on material misrepresentation made by Kolberg to their financial detriment. Additionally, information withheld by Kolberg regarding the status of

**181**

outstanding mortgages against the "L" Street property substantially affected the security of the investment. Consequently, Kolberg is guilty of pursuing a course of misrepresentation.

7. Section 494.05(2), *Florida Statutes* (1985) provides:

(2) The license of a licensee may be revoked if the application for the license is found to contain a material misstatement; if the licensee demonstrates by a course of conduct negligence or incompetence in performing any act for which he is required to hold a license under this act; if the licensee misuses or misappropriates moneys, or any other property of any kind whatsoever, entrusted to his care in such a manner as to cause harm to a borrower or lender; if the licensee for a second time shall be bound guilty of any misconduct which warrants his suspension under subsection (1); or if a payment of any amount from the Mortgage Broker Guaranty Fund is made in settlement of a claim pursuant to § 494.044 for an act committed by the licensee.

8. Kolberg owed the Barbers a fiduciary duty to protect them and to afford them every reasonable opportunity to make their investments relying on complete and accurate information. Kolberg breached that duty by failing to provide even a minimal level of disclosure. Kolberg's failure and negligence in providing accurate information established that he is incompetent to perform an act for which a license is required.

9. Section 494.093(2), *Florida Statutes* (1985) provides:

(2) In any matter within the jurisdiction of the department, to knowingly and willfully falsify, conceal, or cover up, by any trick, scheme, or device, a material fact, or make any false or fraudulent statement or representation, or make or use any false writing or document, knowing the same to contain any false or fraudulent statement or entry.

10. For the reasons outlined in paragraph 6 and expanded here, Kolberg, is guilty of knowingly and willfully falsifying and concealing information from the Barbers. Kolberg knew the investment to be a high risk because he, as trustee, was in the process of foreclosure against the property. Further, Kolberg knew of other liens against the property. The estoppel notice given to the Barbers was not accurate or current. The true estoppel notice revealed the loan to be 45 days overdue. Kolberg willfully kept all of the "negative" information regarding the "L" Street investment from the Barbers. An investor, even the most sophisticated, cannot determine whether or not a

182

transaction is a desirable investment without an accurate, complete disclosure.

11. Section 494.06(3), *Florida Statutes* (1985) provides:

(3) All books, accounts, records and documents of licensees, including a closing statement signed by the borrower shall be preserved and available for examination by the department for at least 5 years from date of original entry.

12. Kolberg did not maintain all records concerning the Barber transaction as he could not make them available for inspection. The records obtained during the Department's investigation were incomplete and incorrect. Kolberg failed to show the true status of the first mortgage to the Barbers. Additionally, estoppel reports for the Ropet Anlagen and David Marsh mortgages were not included in the records of this transaction. Accordingly, Kolberg is guilty of failing to maintain all records.

13. Section 494.05(1)(c), *Florida Statutes* (1985) provides that the Department may take disciplinary action against a licensee for:

(c) Failure to disburse funds in accordance with his agreements.

14. Kolberg, acting as agent for the Barbers, advised the closing agent, Manor Title, to deduct various expenses from the proceeds of the Medici loan. These expenses were paid without authority from the lenders or borrowers and included a credit report (never given to the lenders), costs of foreclosure (incurred by Kolberg, never disclosed to the lenders), and attorneys fees (incurred by Kolberg, never disclosed). By the time the Barber/Medici loan closed, the borrower did not examine the documents or have much inclination to do so. The closing simply avoided the foreclosure which had been instituted by Kolberg, as trustee for Ropet Anlagen. The Barber/Medici loan merely delayed the inevitable (foreclosure against the property) and gave Kolberg an opportunit to get Ropet Anllagen's investment out. Manor Title would not have known to deduct the expenses noted above but for Kolberg's directions. Consequently, Kolberg caused a disbursement of funds contrary to the interests of the loan participants and contrary to his agreement and responsibility to the lenders. Thus Kolberg is guilty of the violation alleged in Count V.

15. Section 494.05(1)(h), *Florida Statutes* (1985) provides that the Department may take disciplinary action against a licensee for:

(h) Conduct which would be the cause for denial of license.

16. Section 494.04(4), *Florida Statutes* (1985) provides:

(4) Each application for a license or for a renewal thereof shall be

**183**

made in writing, on such forms and in such manner and accompanied by such evidence in support of such application as prescribed by the department. An investigation fee of $50, which shall not be subject to refund, shall be paid by each new applicant, other than for a branch office. The department shall require such information with regard to the applicant as it may deem desirable, with due regard to the paramount interest of the public, as to the experience, background, honesty, truthfulness, integrity, and competency of the applicant as to financial transactions involving primary or subordinate mortgage financing, and when the applicant is a person other than an individual, as to the honesty, truthfulness, integrity, and competency of any officer or director of such corporation, association, or other group, or the members of such partnership. For examination purposes, the department may prepare a handbook for mortgage brokers and distribute it on request to applicants, provided a reasonable charge shall be made therefor. Each applicant, including designated officers or members as otherwise provided in this section, shall file a complete set of fingerprints taken by an authorized law enforcement officer. Such fingerprints shall be submitted to the Department of Law Enforcement or the Federal Bureau of Investigation for state and federal processing.

17. Qualities of honesty, truthfulness, integrity, and competency as to financial transactions involving primary or subordinate mortgage financing are required for licensure. Proof of a departure from any of these would subject the licensee to disciplinary action. For the reasons previously outlined in paragraph 8, the Department has established Kolberg is incompetent to protect even the most elementary interest of participants involved in a mortgage financing transaction. More important to the facts of this case, however, is the lack of honesty, truthfulness, and integrity exhibited by Kolberg put the interests of the Barbers above those of Ropet Anlagen. Additionally since Kolberg did not make a disclosure regarding Ropet, the Barbers were unable to foresee that Kolberg might have another primary interest in the loan. Kolberg is, therefore guilty of the violation alleged in Count VI.

18. The department withdrew Count VII at hearing. Accordingly, no conclusion is reached as to that alleged violation.

19. Section 494.05(1)(e), *Florida Statutes* (1985) provides that the Department may take disciplinary action against a licensee for:

(e) Failure to account or deliver to any person any personal property such as money, fund, deposit, check, draft, mortgage, or other document, or thing of value, which has come into his hands, and

184

which is not his property, or which he is not in law or equity entitled to retain, under the circumstances, and at the time which has been agreed upon, or is required by law, or, in the absence of a fixed time, upon demand of the person entitled to such accounting and delivery.

20. The Barbers tendered their $53,000 investment to Manor Title. There is no evidence from which to conclude Kolberg holds or has held money which, in law or equity, he is not entitled to retain. Consequently, Kolberg is not guilty of the violation alleged in Count VIII.

21. Section 494.04(1), *Florida Statutes* (1985) provides:

(1) No person may act as a mortgage broker or mortgage solicitor in this state, or in, out of, or from offices in this state, without a license therefor as provided in this act.

22. Section 494.02(3), *Florida Statutes* (1985) defines "mortgage broker" as follows:

(3) "Mortgage broker" means any person not exempt under § 494.03 who for compensation or gain, or in the expectation of compensation or gain, either directly or indirectly makes, negotiates, acquires, sells, or arranges for, or offers to make, negotiate, acquire, sell, or arrange for, a mortgage loan or mortgage loan commitment. This subsection shall not apply to transactions involving the sale or purchase of notes or bonds secured by mortgages which are subject to registration by the department.

23. Kolberg was not exempt under Section 494.03, *Florida Statutes* (1985). In at least two instances Kolberg negotiated and arranged loans prior to becoming licensed and prior to passing the mortgage broker examination. That Kolberg subsequently became properly licensed does not excuse the prior violation. Thus Kolberg is guilty of the violation in Count IX.

24. Section 494.08(9), *Florida Statutes* (1985) provides:

(9) Each mortgage or instrument securing a note delivered to a lender on other than a first mortgage shall be accompanied by a statement showing the balance owed by the mortgagor on any existing mortgages prior to this investment and the status of such existing mortgages. The provisions of this subsection shall not apply to mortgages insured by an agency of the Federal Government.

25. Implicit in this requirement is the condition that the statement showing the balance owed be correct. In the case at issue, Kolberg failed to supply correct statements. The statement which was given to

185

the lenders was false. For this failure to comply, Kolberg is guilty of the violation set forth in Count X.

26. Section 494.08(7), *Florida Statutes* (1985) provides:

(7) Each mortgage negotiated pursuant to this chapter shall include, with a copy delivered to the lender, a mortgagee's title insurance policy or an opinion of title from an attorney who is licensed to practice law in this state, unless waived in writing by the lender, on the land which is described in the mortgage. The policy or opinion shall reflect the priority of the mortgage.

27. The Barber/Medici loan transaction closed in mid-January, 1986. The Barbers did not receive a mortgagee title insurance policy until March, 1986. Section 494.08(7), *Florida Statutes* contemplates that the required policy be issued at or near the time of closing. This is required to satisfy the purpose of the section (to reflect the lender's priority). The Barbers did not waive this requirement. Kolberg could not satisfy this requirement due to complications with David Marsh. The Barbers were not made aware of these complications until after the fact. The delay in issuing the title policy was necessary in order to avoid having the Barbers find out that the priority of their mortgage was in jeopardy. Because Kolberg's concealment of the Marsh complications and resultant delay in issuance of the policy effectively circumvented the purpose of the law, he is guilty of the violation alleged in Count XI.

28. It should be noted that portions of Chapter 494, *Florida Statutes* (1985) were amended in 1986. At all times pertinent to this cause, the prior statutes were in effect. Additionally, since Chapter 86-68, Laws of Florida, reenacted, in substance, the relevant sections, the law has been continually in force and disciplinary action may be taken against the licensees. *Drury v. Harding,* 461 So.2d 104 (Fla. 1984); *Solloway v. Department of Professional Regulation,* 421 So.2d 573 (Fla. 3d DCA 1982).

## RECOMMENDATION

Based on the foregoing Findings of Fact and Conclusions of Law, it is

RECOMMENDED:

That the Department of Banking and Finance, Office of the Comptroller, enter a Final Order revoking the mortgage broker license issued to Dieter Kolberg and Diko Investments, Inc.

DONE and RECOMMENDED this 30th day of November, 1986, in Tallahassee, Florida.